J. W. STEELE, *Appellee*, v. THE ST. LOUIS & SAN
FRANCISCO RAILROAD COMPANY, *Appellant*.

No. 17,715.

SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Personal Injuries—Defective Tools—Contributory Negligence.* When a boilermaker's helper is by the employer directed to go inside an engine tank to assist in removing rivets, and the workman he is assisting selects a sledge and chisel to work with, the helper is not required to examine such tools in advance to ascertain that they are not defective, but may assume that the equipment will be reasonably safe.

2. EVIDENCE—*Findings—Verdict Conclusive.* When the evidence supports a finding of negligence in furnishing a defective tool and does not conclusively show that the injured workman knew or ought to have known of such defect and its probable consequences, a verdict against the employer, approved by the trial court, will not be disturbed.

Appeal from Wyandotte court of common pleas.
Opinion filed June 8, 1912. Affirmed.

*W. F. Evans, A. L. Berger,* and *Cowherd & Ingraham,* for the appellant.

*C. Angevine, J. K. Cubbison,* and *William G. Holt,* for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff's son, a young man about nineteen years old, was in the employ of the defendant railway company as a boilermaker's helper, and one morning was, together with another workman, engaged in knocking off rivets from the inside of an engine tank. A ladder was let down through an opening and an air hammer was used, and this means proving unsatisfactory the two went to a tool room and procured a sledge hammer and chisel, after discussing the matter and suggesting that they could do better work with them than with the air hammer. The other workman, Lally, a boilermaker's apprentice, selected

both the implements.   The chisel was about two and a half feet long, and the method of use was for Steele to hold this against the rivet head while Lally applied the force with the sledge, which weighed about nine pounds, the striking ends being about two and a half to three inches in diameter.   Steele used the sledge for a while, but not having a good aim Lally took it, Steele holding the chisel, his position being such that the top end came about even with his face.   He had had no experience at this kind of work.   A sixteen-candle-power electric light was suspended inside the tank, and this having failed Lally spoke about it to the assistant foreman who directed that a candle be procured and used until the light could be fixed.   A candle was obtained and set upon the bottom of the tank and braced by a board or scantling.   The work proceeded by this light for about half an hour, when Steele, while holding the chisel, was struck in the eye.   He immediately left the tank and was taken to a doctor, who testified that he found the eye very much inflamed and swollen, the cornea punctured with two pieces of metal on the anterior chamber, that he removed two pieces of metal, one being about one-eighth of an inch long and about one-third as wide and perhaps as thick as ordinary writing paper.   The pieces were irregular, one end not as wide as the other, of light-gray color, one being about twice as large as the other.   The eye was completely destroyed and the other eye affected materially for some months.   Another physician, who occupied an adjoining office, gave substantially the same description of the pieces of metal and the injury.

This action was brought by Steele's father to recover for loss of services.   The petition, aside from extended averments of failure to furnish proper light, alleged that the defendant furnished a steel chisel bar and a sledge hammer with which to cut rivets:

"The said chisel bar furnished to the said John Elmer Steele and said John Lally with which to cut said rivets, was old, worn, battered and defective, and the

head thereof was so worn and battered by long-continued use that flakes and splinters of steel, formed by the constant hammering on the head of said chisel bar, had formed upon and around the head thereof, and had become loosened and were liable to fly therefrom when struck by the said sledge hammer, and injure the person using the same, and said chisel bar, by reason of such defects, was an improper, unsafe and dangerous tool with which to perform said work. . . . While the said John Elmer Steele and said John Lally were so cutting rivets, and so using said defective and insufficient light and said defective chisel bar, and while the said John Elmer Steele was endeavoring to place the edge of said chisel bar against the rivet to be cut, the said John Lally by reason of such insufficient light, struck the head of said chisel bar a slanting or glancing blow with the head of said sledge hammer, and thereby caused portions or splinters and particles of steel to break off and fly away from the head of said chisel bar, or from the said rivet or tank, and a portion or portions of said steel from the head of said chisel bar, or rivet or tank, so thrown by the force of said blow, struck and entered the left eye of the said John Elmer Steele."

It appears that Steele was subject to the orders of Lally, who selected the sledge and chisel. He asked Lally if there was not danger of rivets flying and hitting him.

"I told him to go ahead and work, that none of the rivets was going to hit him. . . . I was familiar with cutting rivets; he had never cut any rivets there; this tank we were working in was an old tank, rusty. . . . Steele and I talked that morning about being liable to get hit, that some of those slivers from the chisel or from the rivets were liable to hit us; after we found out that the air would not do, then Steele and I went and got a chisel and hammer; then we discussed whether it would not fly the rivets harder with the hammer and the chisel; we did not talk about whether or not the slivers would fly more from the chisel and from the rivets by the use of the chisel and hammer; we discussed it before we got the chisel and hammer, about the flying of slivers from those rivets;

I just went there to the tool box where there was lots of hammers and chisels and helped myself; there was a good many chisels there and a good many hammers; I picked out both the chisel and hammer; Steele was with me."

Steele testified that he knew it was dangerous in the tank if anything hit him.

"I never knew it was dangerous in there; if I did I would n't have went in; I knew it was dangerous if hit with them; sure, I knew I had to look out and not let any of them hit me or they would hurt me. . . . The end of the chisel, where I struck it with the sledge, was battered around, and little pieces of fringe or whatever you call it was hanging off; parts of the chisel hanging down where it had been struck. · . . . I worked with the candle about a half hour before I was hurt; I was holding the chisel bar at the time I was hurt."

On cross-examination:

"At the time I was hit, I had my face turned toward the striker; if that chisel was half a foot longer, I don't know that it would still be beyond my head; when the rivet was knocked off, they went on up in front; at the time I was hurt I never got no rivet; it went up in front, I guess; I did not see it; I don't know where it went to; I grabbed my hand to my eye; I don't see how a piece of it could have hit me; it never hit me; I did not know where the pieces came from that hit me in the eye."

Lally testified:

"Striking sledge was all right; the chisel had been worn down around the edge from striking; the top of the bar when you hit it on top with the sledge hammer little burs kind of flatten down; little burs will hang over the top of the bar; I mean around the edges; I don't know what kind of a blow I struck at the time of the happening of the accident."

On cross-examination he testified that he had previously stated that "the tools were all right; nothing the matter with the tools, the chisel or the hammer; I said a while ago that the top of the chisel was flat-

tened; it was in good condition; I would n't say the rivet hit him in the eye;" that he "examined the head of the chisel bar to see if any part of it was broken off and found none of it was broken off and was battered up very little on the head. . . . There was some hanging over the top, but none broken off."

The case was tried very largely on the theory of insufficient light, but Steele's evidence was to the effect that he could see all right, although the entire testimony and description of the situation make it clear enough that the light furnished by the candle was inferior to the electric light previously used. The court instructed the jury quite fully, and as to the allegation of a defective chisel charged that the plaintiff might recover if at the time "a piece of steel or fragment from said chisel, or bolt or tank, on being struck with a sledge hammer in the hands of a fellow workman in the operation of cutting off said rivets, or bolts, flew off and struck the said plaintiff's son in the left eye, destroying the sight thereof; that said chisel was defective in that it was old, worn and battered at the head thereof, as described in the petition, . . . and that such defects and insufficiency were not known to the plaintiff, and by the exercise of reasonable care and caution on his part could not and would not have been known to him, and that said sliver of piece of steel or iron was caused to fly from said chisel, rivet or tank, by reason of the defects in said chisel, or the light aforesaid."

The jury returned a verdict for the plaintiff, and the only errors argued are the overruling of the demurrer to the evidence and the refusal to instruct a verdict for the defendant. The testimony was somewhat voluminous and in great detail covered the points indicated by the foregoing quotations as well as others urged upon the trial. The sole question for determination is whether, in view of the allegations, the testimony regarding the condition of the chisel head and the

injury formed any reasonable basis whatever for the verdict. It is argued that Steele knew as much about the chisel as the defendant did and therefore the plaintiff can not recover. But he had a right to work inside the tank by candle light until the electric light was restored or replaced and he was authorized to assume that his employer would supply him with tools fit to work with. If the chisel was in fact defective, as the evidence shows, then he was not at fault for using it unless he knew or reasonably should have known of its defect and the dangers likely to arise therefrom. In *Railway Co. v. Weikal,* 73 Kan. 763, 84 Pac. 720, the injury was caused by a chisel from which a chip flew and destroyed the eye. But it was expressly stated that "there was no defect in the tools used." (p. 763.) It was simply the case of a chip flying from a chisel free from defect and striking a gearing and rebounding—a danger which the plaintiff knew was incident to the character of work he was doing. *Gillaspie v. Iron-works Co.,* 76 Kan. 70, 90 Pac. 760, was a case involving the loss of an eye by a sliver flying from a tool used to receive blows from a sledge in riveting I-beams. The plaintiff voluntarily, with another, selected the tool used, knowing it was not of the required size, and that it was old, rusty, worn and fringed around the edge with hanging particles of steel. It was held that the defect and insufficiency of the instrument were apparent to a man of his maturity and experience and that he assumed the risk of its use. Other cases with different facts and conditions were distinguished. In the Quinlan case (*Railway Co. v. Quinlan,* 77 Kan. 126, 93 Pac. 632) the plaintiff was engaged in work very similar to that of Steele, the sledge instead of the chisel being defective, a sliver of steel flying therefrom and destroying his eye. His helper had selected the sledge, and it was said:

"It was the master's duty to provide the helper with a fit tool. It was not incumbent upon the plaintiff to

Steele v. Railway Co.

stop his work to see if that duty had been performed. He could rest upon the assumption that the master would not permit a helper to appear with a defective sledge. Therefore, unless his attention was in fact drawn to the imperfections of the sledge, or unless the sledge was so obtruded upon his gaze that he could not but observe it, the injury could not be charged to any want of care or breach of duty on his part." (p. 129.)

When Steele went to work in the tank he could rightfully assume that the company would provide him with such tools and equipment as to make it reasonably safe to work there, and while he knew there was danger of chips flying from the rivets or from the tank, or from a sledge or chisel, he was not called upon so to examine such tools in advance as to assure himself that the ordinary hazards incident to the work when performed with proper tools were to be increased by supplying those which were defective.

Whether under all the circumstances shown he knew or ought to have known the extent and probable effect of the alleged defect in the chisel was a question for the jury to determine from the evidence and not one for the trial court to decide. The record furnishes sufficient basis for different views regarding this very close question and the court below approved the one taken by the jury.

The judgment is affirmed.